[Civ. No. 43393. Second Dist., Div. Five. May 30, 1975.]

FRANK PEPPER et al., Plaintiffs and Respondents, v.
ALBERT S. UNDERWOOD et al., Defendants and Appellants.

## COUNSEL

Cohen, Cearnal, England, Whitfield & Osborne, Thomas B. Osborne, James L. Spencer, Griffith & Thornburgh, F. Brian Rapp and Eric R. Van de Water for Defendants and Appellants.

Henderson, Goodwin, Marking & Rogers, and Robert E. Goodwin for Plaintiffs and Respondents.

## OPINION

**LORING, J.**\*—Frank and Helen Pepper (Peppers)[1] were the purchasers of a motel which was sold to them by Albert and Kathleen Underwood (Underwoods)[1] and Ronnie and Conchita Combs (Combs).[1] Peppers filed a complaint for damages joining the Underwoods and Combs and

---

\*Assigned by the Chairman of the Judicial Council.

[1] The wives—Helen Pepper, Kathleen Underwood and Conchita Combs—do not appear to have played any major role in this controversy and we will therefore hereafter, for sake of simplicity, use the surnames of Pepper, Underwood and Combs to refer to the husbands respectively, unless otherwise noted.

the realtors in the transaction—Silvio Di Loreto (Di Loreto), doing business as Sunset Company Realtors, Jack Woolsey (Woolsey) and James Dolan (Dolan). The first cause of action alleged actual fraud and the second cause of action alleged negligent misrepresentations. The third cause of action was against the realtors Di Loreto, Woolsey and Dolan, only, for constructive fraud. A jury trial resulted in a judgment in favor of Peppers in the sum of $51,205.37 for general damages, plus costs against all of the defendants. All of the defendants appeal from the judgment entered on the verdicts.[2]

## CONTENTIONS

Appellants' Di Loreto, Woolsey and Dolan, as defendants, contend on appeal that:

I The court committed reversible error in instructing the jury on the burden of proof.

II The court committed reversible error in admitting into evidence the Code of Ethics of the National Association of Real Estate Boards.[3]

---

[2]The judgment in this case indicates that Albert and Kathleen Underwood filed a cross-complaint against the Peppers and that Di Loreto, doing business as Sunset Company Realtors also filed a cross-complaint against Peppers seeking to collect on a promissory note given for their realtors' commissions, and that the jury rendered a verdict against all cross-complainants. The clerk's transcript includes the Underwood cross-complaint which was to collect a $10,000 promissory note given as a part of the purchase price.* The Di Loreto cross-complaint was to collect on an $18,500 promissory note given in payment of the brokers' commissions, but which apparently was also deductible from the purchase price. The notices of appeal constitute an appeal from the entire judgment. However, the notices of appeal appear to be only on behalf of "defendants," the briefs on file herein have been filed on behalf of the various "defendants." No brief has been filed on behalf of the cross-complainants. The title of all of the briefs is solely in the name of "plaintiffs and respondents" and "defendants and appellants" with no reference to cross-complainants or cross-defendants. No arguments are advanced on behalf of cross-complainants Underwoods. We therefore treat the appeal, if any, from the judgment insofar as it relates to said cross-complainants Underwoods as abandoned. The judgment insofar as it relates to Underwoods cross-complainant will be affirmed on the ground that the appeal therefrom by said cross-complainants, if any, has been abandoned.

*A note on an instruction indicates that the cross-complaint was non-suited; but this note was apparently in error since the judgment sets forth a judgment on the cross-complaint.

[3]Di Loreto, Woolsey, and Dolan argue in the body of their opening brief (but not as an issue with a separate heading) that the court committed error in its instructions on the issue of damages.

Di Loreto, d.b.a., Sunset Realty, also argues certain errors in regard to instructions relating to the cross-complaint of Di Loreto. These contentions are commingled with contentions in connection with the Peppers complaint and therefore violate the rules governing appeals. (See 6 Witkin, Cal. Procedure (2d ed.) Appeal,· § 420, p. 4388.) However, these contentions will nevertheless be discussed, *infra.*

Appellants' Underwood and Combs, as defendants, contend on appeal that:

I There is insufficient evidence to support a finding of either fraud or negligent misrepresentation.

II The court committed reversible error by denying Underwood's and Combs' motion for nonsuit.

III The court committed reversible error by giving misleading and confusing jury instructions.

IV The failure to instruct on the proper measure of damages constitutes reversible error.

V The court improperly denied the motion for judgment notwithstanding the verdict.

## FACTS

Frank Pepper had been a maintenance supervisor for a large motel in San Mateo. Pepper's only other real estate experience had been the purchase of a home and a lot. Pepper had in his mind the idea to move his family to Santa Barbara and buy a house and a business.

In January of 1971, on a visit to Santa Barbara, Pepper dropped into one of the offices of Di Loreto, doing business as Sunset Realty Company, having seen its ads in the local newspaper. There Pepper met Woolsey, a real estate salesman, and Dolan, a real estate broker. Noting Pepper's background, Woolsey informed Pepper that Dolan specialized in motels. Dolan indicated to Pepper that an effort would be made to ascertain if there were suitable motels available for purchase in the Santa Barbara area.

Underwood and Combs were the owners of the Tropicana Manor Motel. It was purchased in January 1969, and was a family operation. Ronnie Combs was the son, and Conchita Combs was the daughter-in-law of Kathleen Underwood, and Albert Underwood was Ronnie Combs' stepfather. When contacted in March 1971, Ronnie Combs advised Dolan that the motel was for sale and granted permission to show it.

In mid-March 1971, Pepper traveled alone from San Mateo to Santa Barbara to look at the Tropicana Manor Motel. Since Dolan had indicated they would be talking about figures and different things regarding the motel, Kathleen Underwood contacted the individual who prepared the motel's income tax, Mr. Brewer of H. & R. Block, and requested him to prepare a summary of income tax information.

Dolan requested Ronnie Combs to provide him with financial statements to show the performance of the motel to be used as a "guideline" in determining its potential profitability for Pepper. Dolan gave Combs a few days to prepare the statements. Combs made an abstract of the operating expenses for 1970 from the checkbook. These documents were admitted at trial. Combs, who authored these documents, dropped out of school in the ninth grade and his only prior work experience was that of a liquor store clerk and a truck driver.

A comparison of the statements made by Combs and the 1970 tax returns, subsequently supplied, contained discrepancies between the two. The expenses as shown by Combs were more than $12,000 less than as stated on the tax returns. Combs stated the gross income to be more than $2,000 greater than as shown in the tax return. Thus the statements by Combs showed a net income of $24,529, while the income tax return showed net income from operations of $10,275. Only $2,500 of the difference was sought to be explained, the rest of the difference was left unexplained.

Pepper returned to Santa Barbara the next weekend and again inspected the motel. Following this second inspection, Pepper returned to the realtor's office where he was given a copy of the income and expense statement prepared by Combs. Pepper indicated at that time that he would be interested in purchasing the motel, if the realtor could arrange the terms of financing. Pepper used the Combs financial statements as his "bible."

Pepper was later informed by Woolsey that the financing had been worked out. Pepper then executed a letter of intent to purchase the motel, quit his job, sold his house, and moved to Santa Barbara. Also on April 2, 1971, Woolsey accepted the summary of income tax which had been prepared by Brewer of H. & R. Block from Kathleen Underwood, and said that would suffice until the actual income tax returns were needed. Also on this date, Pepper met with Di Loreto who reviewed the statement by Combs and increased some of the expenses as a means of

making sure that Pepper had a cushion. Di Loreto thought the expenses shown by Combs were obviously low.

On approximately April 8, 1971, the Peppers moved into a room at the motel. Subsequently, Pepper met with the prior owners and Di Loreto. The prior owners felt the expenses were small compared to what they spent when they operated the motel. Di Loreto adjusted the expenses which Pepper would have and the increased financing, and said that at least $12,000 would be the net income figure, and that this was a good investment. Although Pepper was at the meeting he stated to Di Loreto that he did not understand figures and was relying on him. Di Loreto denied this, but Mrs. Tillion, one of the prior owners confirmed that Pepper called them his agents in their presence.

Three or four days before the escrow was to close, Woolsey obtained a copy of the 1970 tax returns and met with Pepper at the motel. Di Loreto was out of the country but had agreed that someone would review the returns together with Pepper so they could give Pepper assurances as to profitability. Woolsey, who had an economics background made the analysis, and twice left for a time to discuss the returns with the sellers who were still managing the motel.

Woolsey told Pepper that the tax returns were in accordance with the financial statements and were all right. Woolsey admitted at trial that he did not discover the $12,000 discrepancy. He also admitted that he did not deduct the additional mortgage payments that Pepper would have to pay from the net income as shown by the tax return. Had this analysis been done, a net income of $3,700 rather than the $12,000 as calculated by Di Loreto would have been discovered.

The transaction closed April 30, 1971, and Peppers took possession on May 1, 1971. Subsequent to taking possession Pepper began construction projects in the front of the motel, he neglected the landscaping, the tourist trade was lower, and the Peppers fell behind in their payments. The holders of various secured interests took action to foreclose, and Pepper relinquished the motel to Mrs. Tillion and Mrs. Downie on October 15, 1971.

DISCUSSION

■ We have concluded that reversal of this case is required because the jury was erroneously instructed on several aspects of the law. We will

commence with the most simple and obvious error although chronologically it would be one of the last areas to be considered—damages. The only instruction which the court gave on the issue of damages was as follows:

"In the event that you find any one or more of the defendants liable for fraud, that is, intentional misrepresentation, negligent misrepresentation, or violation of a fiduciary duty in this action, then the plaintiffs, Mr. and Mrs. Pepper, are entitled to an award of damages equal to the sum of the following: all amounts of the money they actually and reasonably expended in reliance upon the fraud; an amount which will compensate them for any loss of profits which were reasonably anticipated and would have been earned from the motel, had it been as profitable as represented by defendants.

"In determining the amounts of loss of profits to be awarded, you may make the award for that period of time in the future which you determine may reasonably have been anticipated under all the facts and circumstances involved. Interest at the rate of 7 percent per annum on all amounts expended in reliance on the fraud from the date they were expended through the present, if you determine to award such interest as reasonable."[4] Although other instructions used the word "loss" and repeatedly used the word "damage"[5] the jury was not given any other instruction on the measure of damages or on the meaning of the word "loss" or the meaning of the word "damage." Underwood and Combs requested an instruction on damages (set forth in the margin) which was refused.[6]

---

[4]This instruction is taken from an augmented reporter's transcript. This instruction was given at the request of Peppers.

[5]The jury was instructed that upon certain proof plaintiff would be entitled to recover "the monetary *loss* suffered by Plaintiffs," "the other person was *damaged* as a result" [of the fraud], "the agent is liable for all *damages* caused to his principal;" if an agent breaches his fiduciary duties "not only is he liable for all *damages* caused by his fraud, but" he cannot collect his commission, "[e]very person connected with a fraud is liable for the full amount of *damages*." (Italics added.)

[6]The instruction read:

"If you find that the plaintiff or any of the cross-complainants were defrauded by the defendants or any of the cross-defendants in the transaction, the party defrauded is entitled to recover:

"(1) The difference between the actual value of that which the defrauded person parted and the actual value of that which he received.

"(2) Together with any additional damage arising from the transaction, including

 "(a) amounts of money actually and reasonably expended in reliance upon the fraud;

 "(b) an amount which would compensate the defrauded party for loss of use and

At the time this case was tried the book of approved jury instructions did not include instructions for use in actions for damages for fraud and deceit. Such instructions are now available. For purposes of comparison only, we set forth BAJI No. 12.56[7] an approved instruction defining damages under the commonly called "out of pocket" rule in an action for fraud and deceit. The out of pocket rule is the exclusive measure of

enjoyment of the property to the extent that the loss was proximately caused by the fraud;

"(c) where you find the defrauded parties have been induced by reason of the fraud to sell or otherwise part with property, as have the cross-complainants Underwood, you may award damages which will compensate them for profits or other gains which they might have reasonably earned by use of the property had they retained it.

"(3) Interest at the rate of seven percent (7%) per annum on such amounts which are established to be certain by testimony or calculation as the defrauded party may have expended in reliance on the fraud.

"Civil Code, Section 3343

"Civil Code, Section 3288"

[7]BAJI No. 12.56 reads as follows:

"If, under the court's instructions, you find that plaintiff is entitled to a verdict against defendant, you must then award plaintiff damages, if any, proximately caused by the fraud upon which you base your finding of liability.

"The amount of such award shall include:

"1. The difference, if any, between the actual value of that with which the plaintiff parted and the actual value of that which he received. This is sometimes referred to as the 'out of pocket loss.'

"Actual value means market value. Market value means the highest price, in terms of money, for which real or personal property would sell on the open market; the seller having a reasonable time within which to sell, and being willing to sell but not forced to do so; the buyer being ready, willing and able to buy but not forced to do so, and having a reasonable time and full opportunity to investigate the property in question and to determine its condition, suitability for use, and all of the things about the property that would naturally and reasonably affect its market value.

"2. In addition to his 'out of pocket loss,' if any, plaintiff is entitled to recover any additional damage arising from the particular transaction, including any of the following:

"a. [Amounts actually and reasonably expended in reliance upon the fraud.]

"b. [An amount which would compensate the plaintiff for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud.]

"c. [An amount which will compensate him for profits or other gains which might reasonably have been earned by use of the property had he retained it.]

"d. [An amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud, provided that lost profits from the use or sale of the property shall be recoverable only if and only to the extent that all of the following apply:

(i) The plaintiff acquired the property for the purpose of using or reselling it for a profit.

(ii) The plaintiff reasonably relied on the fraud in entering into the transaction and in anticipating profits from the subsequent use or sale of the property.

(iii) Any loss of profits for which damages are sought under this paragraph have been proximately caused by the fraud and the plaintiff's reliance on it.]"

damages in an action for fraud and deceit. (*Clar* v. *Board of Trade*, 164 Cal.App.2d 636 [331 P.2d 89]; *Central Mutual Ins. Co.* v. *Schmidt*, 152 Cal.App.2d 671 [313 P.2d 132]; *McNeill* v. *Bredberg*, 192 Cal.App.2d 458 [13 Cal.Rptr. 580]; *Mercantile Acceptance Corp.* v. *Globe Indem. Co.*, 210 Cal.App.2d 636 [27 Cal.Rptr. 75]; *Crawford* v. *Nastos*, 182 Cal.App.2d 659 [6 Cal.Rptr. 425, 97 A.L.R.2d 840].) The rejected instruction requested by Combs and Underwood obviously constituted a substantially accurate statement on the measure of damages under the out of pocket rule in actions of fraud and deceit. It seems obvious that by the aforesaid instruction which the Peppers requested and the court gave, the Peppers were requesting the court to instruct the jury on the law of damages under the commonly called "benefit of the bargain" rule. The correct benefit of the bargain rule is set forth in BAJI 12.57.[8] It is manifest that the aforesaid instruction which the Peppers requested and the court gave is not even an accurate statement of the benefit of the bargain rule. The Peppers instruction would allow them to recover the down payment as monies "expended in reliance on the fraud"[9] even though the value of the motel exceeded the value which it would have had if the fraudulent representation had been true. From a layman's point of view the down payment would represent money lost on the deal in view of the subsequent foreclosure, even though such subsequent foreclosure was in no way related to the breach of fiduciary duty. The Peppers instruction (to the extent it would permit recovery of the down payment) assumed or allowed the jury to assume that the subsequent foreclosure was proximately caused by the breach of fiduciary duty. The note to BAJI No. 12.57 indicates that the benefit of bargain rule only applies in real estate transactions where the party guilty of the fraud stands in a fiduciary relationship to the defrauded party (*Walsh* v. *Hooker & Fay*, 212 Cal.App.2d 450 [28 Cal.Rptr. 16]; *Simone* v. *McKee*, 142 Cal.App.2d 307 [298 P.2d 667]; see also *Ford* v. *Cournale*, 36 Cal.App.3d 172 [111 Cal.Rptr. 334]). The benefit of the bargain rule therefore would not have applied to the Underwoods and Combs in any event since they had no fiduciary relationship to the Peppers. The instruction on damages as

---

[8]BAJI 12.57 reads:

"If, under the court's instructions, you find that plaintiff is entitled to a verdict against the defendant, you must then award plaintiff damages in an amount that will reasonably compensate him for all the loss suffered by him and proximately caused by the fraud upon which you base your finding of liability.

"The amount of such award shall be the difference between the actual value of that which the plaintiff received and the value which it would have had if the fraudulent representation had been true. This is sometimes referred to as the "benefit of the bargain."

[9]In fact Peppers seek to justify the award on the ground that it does not exceed the down payment plus one year's lost income.

given did not distinguish between the benefit of the bargain rule as applicable to Di Loreto and his employees and the out of pocket rule as applied to Combs and Underwoods. The Peppers damage instruction is a hybrid—a portion of the benefit of the bargain rule and a portion of the out of pocket rule. The award of $12,000 for loss of the first year's income can be justified, if at all, only under the benefit of the bargain rule which as we conclude is not applicable to Combs and Underwood in any event.

Even if the instruction which Underwoods and Combs requested and the court rejected was inaccurate, it was the duty of the court to instruct the jury correctly on the measure of damages (*Lysick* v. *Walcom,* 258 Cal.App.2d 136, 157, 158 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]; *Trejo* v. *Maciel,* 239 Cal.App.2d 487, 498 [48 Cal.Rptr. 765]; *Thomas* v. *Buttress & McClellan; Inc.,* 141 Cal.App.2d 812, 819 [297 P.2d 768]), and if necessary request counsel to prepare an accurate, or *more* accurate instruction for that purpose.

We conclude that the court committed error in giving the jury the instruction which was given on the measure of damages and in failing to instruct the jury on the correct measure of damages.

Peppers argue that if there was a failure to correctly instruct on damages, such failure was not prejudicial because the verdict was obviously correct. Peppers argue: "Finally, the amount of the verdict is itself proof that no prejudice occurred in any event. The award was $51,205.37.[10] At trial the evidence showed that Respondents invested $39,205.37 in cash in the business. There was repeated testimony that Appellant-Realtors had represented that there was at least $12,000 net spendable available to Mr. Pepper. Those two figures added together exactly total the amount of the verdict. Clearly such a verdict is reasonable, and the components are authorized by law. Civil Code Section 3343, 3288. Moreover, Respondent's testimony was that he gave up his prior employment where he was earning in excess of $12,000 a year serves as an alternative basis for the amount of damages awarded by the jury."

A reference to BAJI No. 12.56 and the authorities on which it is based clearly demonstrates that the argument of Peppers is unsound because the amount of the verdict does not represent an accurate measure of damages in an action for fraud and deceit either under the out of pocket

---

[10]The award of $51,205.37 was against each and all of the defendants without distinction between the brokers and the sellers.

rule or the benefit of the bargain rule. The cash down payment of $39,205.37, plus the loss of $12,000 net spendable [for one year] does not represent the difference between the actual value of that with which Peppers parted and the actual value of that which they received or the difference between the value of what they received and its value if it had been as represented. The total price of the motel was apparently $489,000. If at the time of performance the property had a market value of $500,000, obviously no damage would have been sustained under the out of pocket rule notwithstanding the subsequent loss of the property on foreclosure and the consequent loss of the down payment and the first year's net income. We have been unable to find any evidence in the record regarding the market value of the property at the time of purchase except the testimony of plaintiffs' expert Cargill that the "net spendable income" was $3,765. Normally common sense would suggest that a piece of real property which produced a net spendable annual income of only $3,765 was probably not worth $489,000. However, a motel may not have been the highest and best use for the property and conceivably the property might have been sold immediately for $1,000,000 for use as a high rise office building. Under the out of pocket rule of Civil Code section 3343 no damage is suffered if there is no difference between the purchase price and the market value of the property purchased. (*Gulke* v. *Brock*, 222 Cal.App.2d 459, 460 [35 Cal.Rptr. 200].) Nor do we find any evidence in the record of what the value of the property would have been if the value had been as represented. What is the value of property which produces a net income of $12,000 a year? We are not told. Neither we nor the jury should have been left to speculate on such a subject—evidence should have been produced and the jury correctly instructed on the issue of damages. We note that Peppers do not claim that this is an action for rescission (to recover back what was paid) presumably for the obvious reason that Peppers are no longer in a position to tender back the property which was lost on foreclosure. If tender was not required for any reason, it still could not be treated as an action for rescission because the jury's verdict, as Peppers note, was for the down payment ($39,205.37), plus the loss of expected net income for one year ($12,000). Peppers obviously did not contribute the $12,000, and therefore had no right to receive it back on a theory of rescission.

It was the duty of the court to instruct on all material issues. (*Herbert* v. *Lankershim*, 9 Cal.2d 409, 482 [71 P.2d 220]; and *Jaeger* v. *Chapman*, 95 Cal.App.2d 520, 525 [213 P.2d 404].) The court's failure to correctly instruct on damages and its refusal of the requested instruction on damages left the jury with an inaccurate yardstick. We cannot as a matter

of law treat the amount of the down payment plus loss of one year's expected net income as the equivalent of the difference between the actual value of the property received and the value of that with which the Peppers parted or as the difference between the value of what was received and what would have been received if it had been as represented. It may or may not be. The record provides no answer. It is not true that the error was not prejudicial. Reversal is therefore required on this issue alone.

In a petition for rehearing Peppers earnestly argue that the foregoing opinion is in conflict with cases such as *Burkhouse* v. *Phillips,* 18 Cal.App.3d 661 [96 Cal.Rptr. 197], which allowed proof of subsequent loss of the property on foreclosure. (See *Ford* v. *Cournale, supra.*) We do not agree that there is any conflict. *Burkhouse* applied the out of pocket rule but nevertheless allowed proof of damages from subsequent loss on foreclosure. (BAJI No. 12.56, subpar. 2 cited in fn. 7, is to the same effect.) This is so because Civil Code section 3343[11] permits recovery of "additional damage *arising from the particular transaction.*" In our view, *Burkhouse* when read in its entirety and Civil Code section 3343, when read in its entirety fairly mean that the subsequent event—loss on foreclosure—must be considered in the light of the entire transaction. This is a factor missing from the Peppers damage instruction. Unless the subsequent event—loss on foreclosure—is considered in the light of the *entire transaction,* the jury cannot properly determine whether or not the subsequent event—loss on foreclosure—was either damage or proximately caused by the fraud. Proximate cause is an essential ingredient of the law of damages and is set forth in the introductory clause of BAJI No. 12.56. It is also a necessary element in BAJI No. 12.57.

---

[11]Civil Code section 3343 as it read at the time *Burkhouse* was decided was as follows:

"One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, *together with any additional damage arising from the particular transaction.*

"Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled." (Italics ours.)

Civil Code section 3343 was amended in 1971, but the amendment did not become effective until March 4, 1972. In our view the 1971 amendment did not affect the principles which we consider here. Damages are to be determined as if the date of the fraudulent transaction (*Hancock* v. *Williams,* 99 Cal.App.2d 80 [221 P.2d 129]; *McCue* v. *Bruce Enterprises, Inc.,* 228 Cal.App.2d 21 [39 Cal.Rptr. 125]; *Graf* v. *Sumpter,* 207 Cal.App.2d 391 [24 Cal.Rptr. 590]). The fact that Civil Code section 3343 permits recovery if "additional damage" does not change the measure of damage which is still the out of pocket rule. (*Bagdasarian* v. *Gragnon,* 31 Cal.2d 744, 762 [192 P.2d 935].)

The term proximate cause is not used in the Peppers damage instruction. The term proximate cause was not used in BAJI No. 2.60 (requested by Peppers) which defined the issues which the jury were required to determine. It is true that Peppers requested and the court gave BAJI No. 1.11[12] which used the term proximate cause in connection with a definition of the term "subject to liability" but the term "subject to liability" was not used either in connection with the Peppers damage instruction or BAJI No. 2.60 which defined the issues. It is true that the Peppers damage instruction did use the word "liable" but it is difficult to believe that the jury understood that that meant proximate cause and that proximate cause was an issue when twenty-three instructions aggregating nine pages of the reporter's transcript intervened between BAJI No. 1.11 and the Peppers damage instruction. Consequently, we conclude that the jury was not instructed directly or even by necessary implication that in order to recover the down payment as additional damage which was lost on subsequent foreclosure, the Peppers would have the burden of proving that the subsequent foreclosure was proximately caused by the alleged fraud. In our view, this points up what may well be the primary vice of the Peppers damage instruction. If the property was worth more at time of sale than the sales price (as we suggest, *ante,* by way of example property worth $1,000,000 sold for $500,000), the jury considering the entire transaction might well conclude that the subsequent loss on foreclosure was neither damage nor proximately caused by the alleged fraud, but by bad fiscal management or other factors. Consequently, we adhere to our original view that the jury was not properly instructed on damages and reversal is required on that ground alone.

 For the assistance of court and counsel on retrial we will discuss further issues raised on appeal. Di Loreto, Woolsey and Dolan contend that the court usurped the fact-finding function of the jury by instructing it that Di Loreto was the broker for Pepper[13] notwithstanding the fact

---

[12]BAJI No. 1.11 reads: "The words 'subject to liability', as used in these instructions, mean that [in the absence of certain exceptions or defenses as to which you will be instructed] a defendant is liable for another's damages proximately caused by such defendant's conduct."

[13]The court instructed the jury in part:

"In the Plaintiffs' case against the Defendants Di Loreto, (Sunset Company Realtors), Woolsey and Dolan, because of the fiduciary relationship between a real estate agent and his principals, the Plaintiffs do not have the burden of proving fraud or negligence, but rather these Defendants have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues:

"1. That they exercised the highest good faith in representing the Plaintiffs in the motel transaction;

that there was evidence from which the jury could conclude that Di Loreto was also the agent of Underwood.[14] Admittedly, the great bulk of the evidence demonstrated that Di Loreto (and his employees) were agents for Pepper. Pepper argues: "From these uncontradicted facts, it cannot be disputed that the Appellant-Realtors were acting as agents for Peppers, and thus became bound to fulfill the fiduciary obligations set forth in the instructions. Even if there was some basis in the evidence for finding that the Realtors were also the joint or mutual agents for the Sellers, that would not eliminate their fiduciary obligations to the Peppers."

This may be true but it makes a substantial difference to Di Loreto and Underwood whether Di Loreto was *also* the agent of Underwood.

It might not make any difference to Pepper whether or not Di Loreto and his employees were also agents for Underwood and Combs, but it would make a great deal of difference to Di Loreto (and his employees) since their financial exposure might be reduced. Also it would certainly make a great deal of difference to Underwood and Combs since if agency existed Underwood and Combs might be held liable jointly and severally with Di Loreto and his employees when otherwise they might not be held liable at all. In our view the question of whether Di Loreto and his employees represented Pepper or Underwood and Combs, or both, was an issue of fact to be determined by the jury after appropriate instructions on the law regarding agency. It is true as argued by Pepper that upon proof that Di Loreto was agent for Pepper the burden of proof would shift to Di Loreto to prove that he was not guilty of a breach of fiduciary duty as an agent for Pepper (*Timmsen* v. *Forest E. Olson, Inc.,* 6 Cal.App.3d 860, 871 [86 Cal.Rptr. 359]; *Schwarting* v. *Artel,* 40 Cal.App.2d 433, 441 [105 P.2d 380]). The fact that such principle is true did not relieve the court of the duty of instructing the jury on the law of agency so that it could find precisely what agency existed where there was a factual basis from which the jury might have concluded that Di Loreto (and his employees) were not only agents of Pepper, but were also agents of Underwood and Combs.

---

"2. That they made full disclosure to the Plaintiffs of all material facts relating to the financial condition of the motel which may have influenced the Plaintiffs in their decision to purchase the motel;

"3. That they exercised care, skill and reasonable diligence in ascertaining and communicating all material facts concerning the financial condition to Plaintiffs of the motel."

[14]For example, Underwood apparently paid Di Loreto's brokerage fee.

Underwood and Combs argue that the court committed reversible error in denying their motion for a nonsuit. Underwood and Combs argue that by supplying the 1970 tax returns to Sunset Realty Company (the accuracy of which apparently are not questioned) they were thereby relieved of liability as a matter of law. We do not agree. The argument disregards the fact that an issue nevertheless remained on the matter of "justifiable reliance"—an issue on which the jury was not fully instructed.[15] Although the court in defining the issues stated in a somewhat oblique manner that the plaintiff was required to prove that he "reasonably relied" on the false representations,[16] nowhere did the court define the circumstances which would have to be proven before plaintiff would be justified in relying on the alleged false representations. Likewise, although the court instructed the jury that plaintiffs were not required to make an independent investigation, nowhere did the court instruct on what the legal consequence of an independent investigation would be when evidence had been introduced from which the jury could have concluded that the defrauded party had made an independent investigation. The instruction given dealt with only one side of the coin. In our view justifiable reliance was an issue on which the jury should have been, but was not, correctly instructed on the law.

The motion of Underwood and Combs for a nonsuit and their subsequent motion for judgment notwithstanding the verdict were properly denied. Such motions were properly denied because the issue of agency (whether or not Di Loreto and his employees were agents of both

---

[15]The newly drafted BAJI instructions include Nos. 12.51 and 12.52 which read:

"A party claiming to have been defrauded by a false representation must have relied upon the representations; that is, the representation must have been a proximate cause of his conduct in entering into the transaction and without such representation he would not have entered into such transaction.

"The fraud, if any, need not be the sole proximate cause if it appears that reliance upon the representation substantially influenced such party's action, even though other influences operated as well.

"Reliance upon a representation may be shown by direct evidence or may be inferred from the circumstances." (BAJI No. 12.51.)

"A party claiming to have been defrauded by a false representation must not only have acted in reliance thereon but must have been justified in such reliance, that is, the situation must have been such as to make it reasonable for him, in the light of the circumstances and his intelligence, experience and knowledge, to accept the representation without making an independent inquiry or investigation." (BAJI No. 12.52.)

[16]The court's instructions on plaintiffs' burden of proof read in part: "1. Whether those Defendants or any of them intentionally or negligently made false representations concerning the profits and financial condition of the Tropicana Motel, for the purpose of inducing the Plaintiffs to purchase the motel, which the Plaintiffs reasonably relied on in deciding to purchase the motel, and as a result of which Plaintiffs suffered monetary loss."

buyers and sellers) and the issue of justifiable reliance were issues of fact for the jury to determine under appropriate instructions.

As a further aid to court and counsel in the retrial of this case, we express our view that upon proper proof that the Canons of Ethics adopted by the National Association of Real Estate Agents, established standards of conduct to be adhered to and which were adhered to by real estate brokers and agents in the Santa Barbara area, such canons would be admissible as rebuttable evidence of such standard of care. (*Grudt* v. *City of Los Angeles,* 2 Cal.3d 575, 588 [86 Cal.Rptr. 465, 468 P.2d 825]; *Salgo* v. *Leland Stanford etc. Bd. Trustees,* 154 Cal.App.2d 560, 576-577 [317 P.2d 170]; Witkin, Cal. Evidence (2d ed. 1966) § 358, p. 317, and § 420, p. 380; 35 Cal.Jur.2d, Negligence, § 190, p. 720.) The mere fact that such code of ethics referred to matters not material to the issues in the case, such as patriotism, and others, would not require exclusion of those portions of the Canons of Ethics relating to standards of care which are relevant to the issues in this case upon establishing a proper foundation. The immaterial portions should have been excised.

As we have noted in footnote 3, *ante,* Di Loreto, d.b.a. Sunset Realty, makes certain arguments in connection with his cross-complaint which are not separately stated but commingled with his argument on the appeal from the judgment on the complaint in favor of the Peppers. As noted, this violates the rule governing appeals which requires a separate statement of the issues on appeal. However, we will disregard the violation and consider the matter on the merits.

■ Di Loreto argues that the court usurped the jury's fact-finding function in connection with the cross-complaint because the jury was instructed that Di Loreto had the burden of proving in connection with the cross-complaint that Di Loreto, Dolan and Woolsey were free from any violation of their fiduciary duties to the Peppers. Peppers requested BAJI No. 2.60, the relevant portion of which as it appears in the clerk's transcript, is set forth in the margin.[17] Di Loreto did not request *any* instructions on any subject. The record on appeal does not include any

---

[17]"In the cross action by Silvio Di Loreto (Sunset Company Realtors), Di Loreto XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues:

"1. ~~That the Peppers executed a promissory note for $18,500 to Di Loreto as payment for a real estate commission for the realtor's services in handling the purchase of the Tropicana Motel for the Peppers and that it has not been paid.~~

"1. That Di Loreto, Dolan and Woolsey were ~~entirely~~ free from any violation of their fiduciary duties to the Peppers in connection with that transaction."

discussion between court and counsel regarding the instructions. We are left to speculate why the following paragraph of BAJI No. 2.60 was deleted:

"In the cross action by Silvio Di Loreto (Sunset Company Realtors) Di Loreto has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues:

"1. That the Peppers executed a promissory note for $18,500 to Di Loreto as a payment for a real estate commission for the realtor's services in handling the purchase of the Tropicana Motel for the Peppers and that it has not been paid."

We cannot presume error. Di Loreto, as appellant on the cross-complaint, has the burden of establishing error. (6 Witkin, Cal. Procedure (2d ed.) Appeal, § 235, p. 4225.) In view of the fact that Di Loreto testified that the Peppers were his clients, we will presume in the absence of any showing to the contrary that in preparing instructions to the jury on the issues requiring jury decision, the parties agreed that the promissory note for $18,500 was given by Peppers to Di Loreto for his services as the broker in the deal, that the first paragraph of BAJI No. 2.60, *supra,* which was deleted, was deleted for that reason, and the parties further agreed that the only issue left for determination by the jury was whether or not Di Loreto violated his fiduciary duties. Although the cross-complaint did not specifically allege that the note had been given by the cross-defendants for a valuable consideration, the note was attached to the cross-complaint as an exhibit and incorporated by reference and by its terms, the note recited that it had been given "for value." We think, therefore, Di Loreto had the burden of proving that he gave "value" for the note, i.e., faithful services as a broker. If, as we conclude from this record, the only issue before the jury on the cross-complaint of Di Loreto was whether or not he breached his fiduciary duties then as to that issue Di Loreto had the burden of proof notwithstanding the fact that the issue of faithful performance had been raised by the cross-defendants. In *Timmsen* v. *Forest E. Olson, Inc.,* 6 Cal.App.3d 860, 871 [86 Cal.Rptr. 359], the court said: "When the acts of an agent have been questioned by his principal and the fiduciary relationship has been established, the burden is cast upon the agent to prove that he acted with the utmost good faith toward his principal [citations] and that he make a full disclosure prior to the transaction of all of the facts relating to the transactions under attack."

*Timmsen* v. *Forest E. Olson, Inc., supra,* was an action by a buyer against a broker for damages for breach of fiduciary duty. If the broker

has the burden of proving non-breach of fiduciary duty when he is sued, we see no reason why he should not have the same burden of proof when he sues his client, the buyer, to collect his fees and the only issue for determination is whether or not he breached his fiduciary duties.

In connection with Di Loreto's appeal from the judgment in favor of Peppers on the Peppers complaint, we noted that the jury should have been properly instructed on the law of agency since if Di Loreto was also an agent of Combs and Underwood, that might affect the amount of his liability to Peppers. Such consideration does not apply to Di Loreto's cross-complaint on the promissory note since Combs and Underwood had no right or liability in connection with the note on which Di Loreto's cross-complaint was based.

We conclude that since we cannot presume error and error has not been shown by Di Loreto, the giving of BAJI No. 2.60 does not afford a basis for reversing the judgment in favor of the cross-defendants on the cross-complaint of Di Loreto.

Those portions of the judgment reading:

"WHEREFORE, IT IS ORDERED AND ADJUDGED, that in the matter of Silvio Di Loreto vs. Frank and Helen Pepper, that the Plaintiff, Silvio Di Loreto take nothing by his action and that the Defendants Frank and Helen Pepper do have and recover from the Plaintiff, Silvio Di Loreto, their costs and disbursements incurred in this action, amounting to the sum of _____ Dollars.

"WHEREFORE, IT IS ORDERED AND ADJUDGED, that in the matter of Albert and Kathleen Underwood vs. Frank and Helen Pepper, that the plaintiffs, Albert and Kathleen Underwood take nothing by their action and that the Defendants, Frank and Helen Pepper do have and recover from the Plaintiffs, Albert and Kathleen Underwood their costs and disbursements incurred in this action, amounting to the sum of _____ Dollars."

are affirmed; the remainder of the judgment is reversed.

Kaus, P. J., and Hastings, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied July 30, 1975.